UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

NATHAN S. BERKMAN,

        Petitioner,

           v.                  CAUSE NO. 3:19-CV-750-RLM-MGG

WARDEN,

        Respondent.

<u>OPINION AND ORDER</u>

    Nathan S. Berkman, a prisoner proceeding without a lawyer, filed a habeas corpus petition challenging his 2011 felony murder conviction in Lake County under cause number 45G03-0906-MR-0003. (ECF 1.) For the reasons stated below, the court denies the petition.

## I.    BACKGROUND

    In deciding the petition, the court must presume the facts set forth by the state courts are correct unless Mr. Berkman rebuts this presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1). On direct appeal, the Indiana Court of Appeals set forth the facts as follows:

> In August of 2008, Berkman owed approximately $2000 to Olen Hawkins, from whom he had frequently purchased cocaine. On August 30, 2008, Berkman telephoned Hawkins, told him that he had the money he owed him, and arranged a meeting in a supermarket parking lot. Between 4:00 and 5:00 p.m., Berkman told Arlene Timmerman, his girlfriend and with whom he lived, that [he] was going to leave to obtain money and cocaine and that he had to go by himself. Berkman left at approximately 6:00 p.m., in Timmerman's car.

Berkman met Hawkins in the supermarket parking lot, parked next to him, and entered Hawkins's vehicle. When Hawkins asked Berkman if he had the money that he owed him, Berkman slit Hawkins's throat "from ear to ear and he robbed him for a couple ounces of dope and a bunch of money." Berkman kicked Hawkins's dead body into the passenger seat and drove Hawkins's car back to Timmerman's house, arriving at approximately 9:30 to 10:00 p.m.

When Berkman arrived back at Timmerman's, he yelled for Timmerman. Timmerman went with Berkman to the garage, where she saw Hawkins's dead body in the passenger seat of his car. Berkman told Timmerman that he had cut Hawkins's throat and taken an ounce of cocaine from him. Berkman, Timmerman, and Tanya Sullivan, who was visiting, then smoked crack cocaine in the basement until approximately 1:30 or 2:00 a.m.

Late in the evening of August 31, 2008, or early in the morning of September 1, Berkman retrieved a knife from the kitchen, held it to Timmerman's neck, and said, "Get your f* * * * * * a* * downstairs now." Timmerman managed to elude Berkman, leave, and go to the home of friend Meghan Johnston. At approximately 7:00 or 8:00 a.m. on September 1, 2008, Timmerman called home, Berkman apologized, and Timmerman returned home. Berkman told her later that day that he had formulated a plan to dispose of Hawkins's body, which was still in Hawkins's car in the garage. Early in the morning of September 2, 2008, Berkman drove Hawkins's car to a field with Timmerman following in her car. While Timmerman waited, Berkman doused Hawkins's car with gasoline and set it aflame. Hawkins's burned-out car and remains were discovered on November 19, 2008.

On June 9, 2009, the State charged Berkman with murder and felony murder in the perpetration of robbery, both felonies. On July 27, 2011, a jury acquitted Berkman of murder but failed to reach a verdict on the felony murder count. On August 30, 2011, Berkman's second jury trial began, in which he was charged with felony murder. During its case in chief, the State called Timmerman to testify. Soon thereafter, Timmerman indicated that she was "having an issue[,]" and trial was recessed. When questioned by the trial court in chambers, Timmerman said that she was "very nauseous [and] burning up" and afraid that she might be developing a migraine. The trial court determined that Timmerman was unable to testify and ruled that her testimony from the first trial could be read into the record.

> Later in the trial, on September 7, 2011, the State indicated that it wished to introduce deposition testimony of Paul Barraza, testimony that had been read into the record in the first trial. The deposition of Barraza had been conducted by Berkman's attorney, and the State did not question Barraza during the deposition. The prosecutor indicated that his office gave Barraza's address and telephone number to an investigator but were unable to serve Barraza with a subpoena on August 8, 2011. The prosecutor also indicated that his office had been unable to contact Barraza via telephone, Barraza was subject to at least one open Lake County arrest warrant, and he believed Barraza to be in Florida avoiding the warrant. The trial court allowed the deposition to be read into the record. The jury found Berkman guilty as charged, and on October 3, 2011, the trial court sentenced him to sixty years of incarceration for felony murder.

Berkman v. State, 976 N.E.2d 68, 71-72 (Ind. Ct. App. Sept. 4, 2012) (internal citations omitted).

Mr. Berkman raised these arguments on direct appeal: (1) retrying him for felony murder after he was acquitted on the murder charge violated state and federal double jeopardy principles; (2) the admission of Ms. Timmerman's prior testimony violated Indiana law and the Sixth Amendment's confrontation clause; (3) the admission of Mr. Barraza's prior testimony violated Indiana law and the Sixth Amendment's confrontation clause; and (4) his 60-year sentence was excessive and should be reduced under Indiana Appellate Rule 7(B). Id. at 72-80.

The Indiana Court of Appeals rejected these arguments. Id. As to claim one, the court concluded that the retrial didn't violate double jeopardy principles because murder and felony murder involved different elements and so didn't amount to the same offense. Id. at 72-73. As to claims two and three, the court concluded that the admission of Mr. Barraza's and Ms. Timmerman's prior testimony didn't violate Mr. Berkman's rights because these witnesses were unavailable and Mr. Berkman had

3

an adequate opportunity to cross-examine them when their testimony was given. *Id.* at 74-79. As to the final claim, the court concluded that Mr. Berkman's 60-year sentence was appropriate in light of the "disturbing" nature of the offense and his prior criminal history, including his being on probation at the time of the offense. *Id.* at 79-80. The court affirmed his conviction and sentence in all respects. *Id.* at 80.

Mr. Berkman sought transfer to the Indiana Supreme Court raising all but the double jeopardy claim. (ECF 7-9.) The supreme court denied his petition to transfer without comment. Berkman v. State, 984 N.E.2d 221 (Ind. 2013). He filed a petition for a writ of certiorari to the U.S. Supreme Court, but that too was denied. Berkman v. Indiana, 571 U.S. 863 (2013).

Mr. Berkman then pursued state post-conviction relief. Berkman v. State, 123 N.E.3d 715 (Table), 2019 WL 1247002 (Ind. Ct. App. Mar. 19, 2019). The trial court denied his petition after an evidentiary hearing. *Id.* at *2. Mr. Berkman asserted on appeal that his trial counsel was ineffective in failing to present the jury with evidence of his prior acquittal; in failing to object to a charge of felony murder but not of an underlying felony; and in failing to object to the admission of Ms. Timmerman's prior testimony. *Id.* at *3-*5. He also asserted various claims of free-standing trial errors, including that the trial judge and prosecutor conspired against him, and that the judge abused her discretion in admitting certain evidence. *Id.* at *6.

The Indiana Court of Appeals rejected these arguments. As to the ineffective-assistance claims, the court concluded that evidence of Mr. Berkman's hung jury wasn't admissible under Indiana law, and Indiana law didn't require that he be

independently charged with a felony to be charged with felony murder. *Id.* at *3-*4. The court further concluded that the record reflected that counsel objected vigorously to the admission of Ms. Timmerman's prior testimony at multiple stages of the trial. *Id.* at *3-*5. The court concluded that Mr. Berkman didn't establish deficient performance by his counsel or resulting prejudice.[1] *Id.* at *5. The court found Mr. Berkman's claims of free-standing trial error waived because those claims had to be raised on direct appeal. *Id.* at *6. The court affirmed the denial of post-conviction relief in all respects. *Id.*

Mr. Berkman filed a petition to transfer to the Indiana Supreme Court, reasserting his ineffective assistance claims, as well as several claims of free-standing trial error. (ECF 7-18 at 2-8.) The supreme court denied his petition without comment. Berkman v. State, 132 N.E.3d 384 (Ind. 2019).

Mr. Berkman filed this federal habeas petition, raising the following claims: (1) the admission of Mr. Barraza's deposition testimony violated his Sixth Amendment confrontation clause rights; (2) the admission of Ms. Timmerman's prior testimony violated his Sixth Amendment confrontation clause rights; and (3) his retrial violated the Fifth Amendment's double jeopardy clause. (ECF 1 at 3-11.) The respondent argues that Mr. Berkman's claims are procedurally defaulted or

---

[1] The Indiana Court of Appeals read Mr. Berkman's brief to assert that he also received ineffective assistance from his counsel on direct appeal, but found this claim waived under Indiana Appellate Rule 46(A)(8) as inadequately developed. Berkman v. State, 2019 WL 1247002, at *2 n.1.

otherwise without merit.[2] (ECF 7.) Mr. Berkman's traverse was due December 21, 2020. He filed two separate traverses on December 28 and December 30, along with a motion requesting leave to file a traverse after the deadline. On February 22, 2021, he filed an "affidavit" in support of his petition. His motion for leave to file an untimely traverse is granted to the extent that the court has considered his two late-filed traverses and all supporting documents in deciding the petition. (ECF 16, 17, 18.)

## II.    ANALYSIS

Mr. Berkman's petition is governed by the provisions of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which allows a district court to issue a writ of habeas corpus on behalf of a state prisoner "on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). For relief, the petitioner must meet the stringent requirements of 28 U.S.C. § 2254(d):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

[2] The respondent asserts that the record of Mr. Berkman's original trial wasn't prepared for use in his direct appeal, so it isn't before this court. (*See* ECF 7 at 3 n.1.)

6

^     This standard is "difficult to meet" and "highly deferential." <u>Hoglund v. Neal</u>, 959 F.3d 819, 832 (7th Cir. 2020) (quoting <u>Cullen v. Pinholster</u>, 563 U.S. 170, 181 (2011)). "It is not enough for a petitioner to show the state court's application of federal law was incorrect; rather, he must show the application was unreasonable, which is a 'substantially higher threshold.'" *Id.* (quoting <u>Schriro v. Landrigan</u>, 550 U.S. 465, 473 (2007). The question is not whether the federal habeas court "agree[s] with the state court decision or even whether the state court decision was correct." <u>Gage v. Richardson</u>, 978 F.3d 522, 529 (7th Cir. 2020). Rather, "[a] petitioner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." <u>Hoglund v. Neal</u>, 959 F.3d at 832 (quoting <u>Harrington v. Richter</u>, 562 U.S. 86, 103 (2011)).

### A.     Confrontation Clause Claims

In claims one and two, Mr. Berkman raises related claims that his Sixth Amendment confrontation clause rights were violated when the trial court allowed the prior testimony of Mr. Barraza and Ms. Timmerman to be read to the jury. (ECF 1 at 3-8.) The respondent argues that the state court's resolution of these claims didn't constitute an unreasonable application of Supreme Court precedent. (ECF 7 at 11-16.)

The Sixth Amendment's confrontation clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses

against him." U.S. CONST. AMEND. VI. The clause prohibits "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant . . . had a prior opportunity for cross-examination." Crawford v. Washington, 541 U.S. 36, 53–54 (2004). A witness can't be deemed "unavailable" unless the prosecution made a good-faith effort to secure the witness's presence at trial. Hardy v. Cross, 565 U.S. 65, 70 (2011) (citation omitted). "The lengths to which the prosecution must go to produce a witness . . . is a question of reasonableness." *Id.* (citation omitted).

The Indiana Court of Appeals properly recognized Crawford v. Washington as the governing standard when resolving Mr. Berkman's Confrontation Clause claims on direct appeal. Berkman v. State, 976 N.E.2d at 75. The court analyzed each witness separately, as this court does below.

### 1.   Mr. Barraza's Testimony

Mr. Barraza was an acquaintance of Mr. Berkman's who shared a cell with him at the county jail when Mr. Berkman was in custody on an unrelated offense months after Mr. Hawkins's disappearance. According to Mr. Barraza, Mr. Berkman admitted to him during a series of conversations that he went to meet Mr. Hawkins at the WiseWay parking lot with the intention of robbing him, and that when Hawkins pulled out a "big bag of coke" Mr. Berkman "cut him from ear to ear" and "robbed him for a couple of ounces of dope and a bunch of money." (Trial Transcript ("Tr.") at 1015.) He claimed Mr. Berkman also told him that he "left the guy. . . for

two or three days," while he and Ms. Timmerman used the drugs he had stolen. To get rid of the body, he drove to an abandoned field with Mr. Timmerman following behind him, "ditched the car, took a gas can, poured it on him, lit it on fire . . . left the gas can," and "jumped in the car with Arlene and took off." (*Id.* at 1016.) Mr. Barraza said he didn't have any deal with the prosecution to testify, but claimed that he came forward because he felt Mr. Berkman was "a piece of crap" for killing "somebody's grandfather" over a "sack of drugs."[3] (*Id.* at 1032.)

The Indiana Court of Appeals found an adequate basis in the record to conclude that Mr. Barraza was "unavailable": he couldn't be located and was believed to be hiding out in Florida avoiding an arrest warrant for an unrelated offense. Berkman v. State, 976 N.E.2d at 76. On the second prong, the court concluded that Mr. Berkman had an adequate opportunity to cross-examine at the time of Mr. Barraza deposition. *Id.* The court concluded that under Crawford, admission of this evidence didn't violate Mr. Berkman's confrontation clause rights. *Id.* at 79.

This record doesn't show that the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." Hoglund v. Neal, 959 F.3d at 832. The record contains ample support for the state court's conclusion that Mr. Barraza was unavailable: Mr. Barraza failed to appear at the first trial; the prosecution nevertheless tried to secure his presence at the second trial by

---

[3] Mr. Hawkins was 64 years old at the time of his death. (Tr. at 140.) Mr. Barraza testified that he didn't know Hawkins personally, but that Mr. Berkman told him Hawkins "was an old man," so Barraza assumed Hawkins had children or grandchildren. (*Id.* at 1032.) In Mr. Barraza's view, "that's like somebody killing my dad." (*Id.*)

subpoenaing him, but couldn't find him. <u>Berkman v. Neal</u>, 976 N.E2d at 79. An investigator from the prosecutor's office made efforts to track him down by phone, but to no avail. *Id. T*he last the prosecutor had heard Mr. Barraza was somewhere in Florida trying to avoid an outstanding arrest warrant in Lake County for an unrelated offense. *Id.*

There is nothing in the record to reflect that the prosecution somehow caused the unavailability of this witness, or that it didn't take reasonable steps to secure his presence at trial. Mr. Berkman argues that a more significant effort should have been made to find Mr. Barraza, including issuing another warrant, but "when a witness disappears before trial, it is always possible to think of additional steps that the prosecution might have taken to secure the witness' presence," but "the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising." <u>Hardy v. Cross</u>, 565 U.S. at 71–72. As the state court observed, there was already one outstanding warrant for Mr. Barraza's arrest, and there was little reason to think a second warrant would have yielded a different result. Moreover, "the deferential standard of review set out in 28 U.S.C. § 2254(d) does not permit a federal court to overturn a state court's decision on the question of unavailability [for purposes of a <u>Crawford</u> claim] merely because the federal court identifies additional steps that might have been taken" to secure the witness's presence at trial. *Id.* Based upon the efforts that were made to locate Mr. Barraza, the state court's resolution of this was issue reasonable.

On the second prong, the state court's conclusion that Mr. Berkman had an ample opportunity for cross-examination can't be considered "an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." Hoglund v. Neal, 959 F.3d at 832. "Although the Sixth Amendment guarantees a defendant the right to confront witnesses against him, the use of pre-recorded deposition testimony does not violate that right where the witness is unavailable for trial and the defendant had a prior opportunity for cross-examination." Yu Tian Li v. United States, 648 F.3d 524, 530 (7th Cir. 2011).

Mr. Berkman's counsel conducted a searching examination of Mr. Barraza during the deposition. As Mr. Berkman points out, technically speaking his attorney did not "cross-examine" Mr. Barraza, because counsel was the one conducting the deposition. In other words, counsel was conducting *direct* questioning of Mr. Barraza rather than a cross-examination. Whatever the procedural posture, the record reflects that counsel had ample opportunity to, and did, ask pointed questions aimed at undermining Mr. Barraza's account. As the Indiana Court of Appeals observed, counsel spent "considerable time during the deposition impeaching Barraza with prior criminal convictions and arrests and also exploring his motive for approaching the authorities regarding Berkman's confession." Berkman v. State, 976 N.E.2d at 77. If anything, counsel conducted a broader examination of Mr. Barraza than would have been permitted at trial. During the deposition, counsel was able to elicit a significant amount of testimony impugning Barraza's character, including testimony about his theft of a bike at age nine; a misdemeanor conviction for invasion of privacy;

an arrest for battery; his tumultuous relationships with various women; his long history of drug use; and the removal of his children by state protective services. (*See* Tr. at 937-1035.) Testimony on these topics likely would have been inadmissible had counsel been questioning Mr. Barraza in court, *see* IND. R. EVID. 608, 609, but the jury heard this evidence when the deposition transcript was read into evidence and was able to consider it in weighing Mr. Barraza's credibility.

Mr. Berkman also argues that his rights were violated because he couldn't personally attend Mr. Barraza's deposition. The Indiana Court of Appeals held that Indiana law doesn't specifically prohibit a defendant from attending a discovery deposition. Berkman v. State, 976 N.E.2d at 79. The state court's interpretation of state law binds this court. Earls v. McCaughtry, 379 F.3d 489, 495 (7th Cir. 2004) (a federal habeas court has no authority to "second-guess state courts in interpreting state law"). That Mr. Berkman did not, for whatever reason, personally attend the deposition doesn't mean he didn't have an adequate opportunity for cross-examination. "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20 (1985) (emphasis in original). Mr. Berkman had that opportunity.

There is no indication that his lack of attendance at the deposition prejudiced his rights. Mr. Berkman asserts generally that he could have helped his counsel conduct a better examination had he been present, but he provides no specifics. The 101-page deposition transcript reflects that Mr. Berkman's counsel was well-versed

in the facts surrounding Mr. Berkman's statement to Mr. Barraza and the potential weaknesses in Mr. Barraza's account.[4] Counsel elicited testimony on these points and it was presented to the jury. Based on the record, the state court's denial of Mr. Berkman's confrontation clause claim arising from the admission of Mr. Barraza's prior testimony was not an unreasonable application of Crawford v. Washington. Mr. Berkman can't succeed on this claim.

### 2.    Ms. Timmerman's Testimony

The Indiana Court of Appeals found no error in connection with the admission at the second trial of Ms. Timmerman's testimony from the first trial. The court found a sufficient basis to conclude that she was unavailable, in that she appeared in court after being hospitalized but was too ill to testify. Berkman v. Neal, 976 N.E.2d at 77. On the second prong, the court concluded that Mr. Berkman's counsel had thoroughly cross-examined Ms. Timmerman at the first trial. *Id.* The court therefore concluded that the admission of Ms. Timmerman's prior testimony didn't violate Mr. Berkman's Confrontation Clause rights. *Id.* at 76.

The state court's ruling wasn't "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." Hoglund v. Neal, 959 F.3d at 832. Mr. Berkman had been

---

[4] The record reflects that Mr. Berkman's trial counsel, Tracy Edward Page, had approximately 30 years of experience as an attorney, including as a former prosecutor and a part-time judge, during which time he handled hundreds of jury trials. (ECF 7-14 at 73-74.) The record also reflects that Mr. Berkman was able to have input in counsel's examination of Mr. Barraza even though he wasn't present, as he gave counsel questions to ask Mr. Barraza, which counsel asked. (*Id.* at 75.)

in pretrial detention for nearly two years by the time of the second trial. He sought to be released on bond prior to the second trial; the trial judge denied his request, but she made clear that she intended to move the trial proceedings along as swiftly as possible.[5] (Tr. at 20-24.) The trial began on August 29, 2011, but was adjourned from September 1 to September 6 because of Ms. Timmerman's hospitalization. (ECF 7-1 at 9.) Ms. Timmerman appeared to testify on September 6, but it's apparent that she began to feel ill during the prosecutor's questioning: she complained of feeling hot and tried to remove articles of clothing. (Tr. at 455.) The prosecutor continued with his questioning, but based on her demeanor, the prosecutor asked her if she was okay, and she replied, "No, I'm not." (*Id.* at 463.) The attorneys then approached for a sidebar. It's clear that the judge was upset by this development; she stated, "This is a mess. This is a mess." (*Id.* at 464.) The prosecutor suggested that Ms. Timmerman be deemed medically unavailable, but the judge responded, "Well, she's not medically unavailable. She's here." (*Id.*) After further discussion with the attorneys about how to proceed, the judge stated, "Let's see what happens here, let's just see what happens here." (*Id.* at 465.)

The judge recessed the trial and moved to chambers, where she asked Ms. Timmerman about her condition. Ms. Timmerman said she was "burning up" and "very nauseous" and had only recently been released from the hospital with a

---

[5] Mr. Berkman's counsel also had to rearrange his schedule to accommodate the court's proposed retrial date, (Tr. at 20-23.) and he had another trial scheduled to begin after Mr. Berkman's concluded. (*Id.* at 19, 23.) Counsel testified in the post-conviction proceedings that, although he objected to the admission of Ms. Timmerman's prior testimony, he didn't ask for a continuance because he thought it very unlikely the trial judge would grant one under the circumstances. (ECF 7-14 at 74.)

suspected stroke, seizure, or possibly the onset of multiple sclerosis. (*Id.* at 466.) She said she had thought she was going to throw up on the stand, and was afraid she was "getting another migraine." (*Id.* at 467.) The judge had a staff member get Ms. Timmerman a soft drink and some over-the-counter nausea medication that she requested in an effort to settle her stomach. Watching her, however, the court concluded that "it doesn't even seem possible" that Ms. Timmerman was capable of testifying. (*Id.* at 468.) After further discussion with the attorneys, the court granted the prosecution's request to have Ms. Timmerman's prior testimony read into the record.

Nothing in this record suggests that Ms. Timmerman was feigning illness or trying to avoid testifying, and the prosecution made a good-faith effort to secure her presence. Still, Mr. Berkman thinks the judge should have done more before declaring Ms. Timmerman unavailable, including waiting longer to see if Ms. Timmerman might recover. In Mr. Berkman's view, her problems would likely have cleared up within a matter of a few minutes. Maybe so, but the record also supports the conclusion that Ms. Timmerman's problems were far more serious, as she said she almost vomited on the stand and thought she was getting a migraine. Ms. Timmerman had a history of migraines that caused her to see flashing lights and other visual disturbances. (*Id.* at 448-49.) She had only been recently released from the hospital and was undergoing testing for potentially serious medical conditions. Federal habeas relief is not available merely because a court with the benefit of comfortable hindsight can envision other steps that might have been taken to secure

a witness's live testimony before declaring her unavailable. <u>Hardy v. Cross</u>, 565 U.S. at 71–72.

In <u>Hardy v. Cross</u>, 565 U.S. 65 (2011), the witness at issue was also the state's primary witness. The witness had testified at the defendant's first trial, which resulted in a hung jury, and had indicated a willingness to testify at his retrial. A few days before the scheduled retrial she left her home and stopped contacting the prosecutor's office. The prosecution spent a week unsuccessfully trying to locate her, at which point she was declared unavailable and her testimony from the first trial read into the record. Just as in Mr. Berkman's case, the witness might conceivably have been able to provide live testimony had the trial proceedings had been delayed a bit longer, or if other steps been taken. Yet the Supreme Court found that the prosecution had acted reasonably under the circumstances, and that the state court did not err for purposes of AEDPA in concluding that this witness was unavailable within the meaning of *Crawford. Id.*

The judge in Mr. Berkman's case might have waited additional time before declaring Ms. Timmerman unavailable, though it's highly unlikely that she could have done so without serious disruption to the court calendar and the schedules of jurors, witnesses, and lawyers. By the same token, the judge might have been reluctant to further delay the trial indefinitely, or declare another mistrial, in hopes that Ms. Timmerman would recover enough to testify. "Where . . . the facts before the state court allow two reasonable but competing conclusions, this court must defer to the choice made by the state court even if this court might have reached the opposite

conclusion." Yarborough v. Alvarado, 541 U.S. 652, 664 (2004). The trial already had been extended for five days to accommodate Ms. Timmerman's hospitalization. In light of that earlier delay, Ms. Timmerman's statement that she was developing a migraine (a condition that had incapacitated her before), and her demeanor in court as reflected by the trial judge's comments, the state court's conclusion that Ms. Timmerman was "unavailable" was not objectively unreasonable.

On the second prong, Mr. Berkman's counsel vigorously cross-examined Ms. Timmerman during the first trial, drawing out inconsistencies in her testimony and her statements to police. (Tr. at 450-679.) He also elicited testimony about her extensive drug use and her prior criminal record.[6] Mr. Berkman complains that his counsel wasn't able to cross-examine Ms. Timmerman about a more recent arrest for drug possession, but there is no reason to think evidence of the arrest would have been admissible under Indiana law. See IND. R. EVID. 608, 609. Although the jury did not get to watch Ms. Timmerman answering the more difficult questions posed by Mr. Berkman's attorney, jurors had a chance to watch her for at least for a short period before she became ill on the stand. Under these circumstances, the state court's denial of this claim was not an unreasonable application of Crawford v. Washington.

Even if the state court's resolution of this claim amounted to an unreasonable application of Crawford, Mr. Berkman would also have to establish that the

_____

[6] In addition to Ms. Timmerman's own admissions about her drug use, witness Shawn Black was permitted to testify about Ms. Timmerman's heavy drug use. (Tr. at 125.)

admission of this testimony resulted in "actual prejudice." Armfield v. Nicklaus, 985
F.3d 536, 543 (7th Cir. 2021) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637
(1993). Relief is proper under this standard only if a federal habeas court has "grave
doubt about whether a trial error of federal law had substantial and injurious effect
or influence in determining the jury's verdict." *Id.* (citation omitted). The court must
review the entire record, and inquire whether a jury "would have arrived at the same
verdict, absent the error." *Id.* For confrontation clause errors, a court should consider
such factors as "the importance of the disclosed statements to the prosecution's case,
whether the disclosure was cumulative, the presence of corroborating evidence, and
the extent of cross-examination permitted." *Id.* at 544.

Ms. Timmerman's testimony was critical to the state's case, but other evidence
corroborated her account. Police recovered a cellphone from the roof of the WiseWay,
consistent with Ms. Timmerman's testimony that Mr. Berkman told her he threw Mr.
Hawkins's phone there to get rid of it. The phone couldn't be identified digitally
because the SIM card had been removed, but Mr. Hawkins's wife firmly identified it
as his phone based on the brand and appearance. (Tr. at 151.) Ms. Timmerman was
also able to direct police to the exact location where Mr. Hawkins's body was
recovered.

Mr. Barraza offered damaging testimony about Mr. Berkman's admissions to
him, and his account coincided with Ms. Timmerman's. Mr. Barraza knew details
about the victim, knew a gas can was left at the scene, and knew about Mr. Berkman's

drug binge after he returned from meeting Mr. Hawkins, which was corroborated not only by Ms. Timmerman but by Mr. Berkman's friend, Tanya Sullivan.[7]

Ms. Sullivan -- Mr. Berkman's friend of several years with no apparent motive to give false testimony -- testified that she went to Mr. Berkman's home that night because he was going to give her some cocaine. She waited there for him for hours, even though he had been expected back much earlier. She and Ms. Timmerman were sitting on the front porch when he got home, but Mr. Berkman immediately "yelled" for Ms. Timmerman to come to a side door. (Tr. at 345.) Ms. Timmerman was gone for about 30 minutes, during which time Ms. Sullivan could hear them arguing, and Ms. Timmerman appeared "distraught" when she returned. (*Id.* at 348.) Ms. Sullivan later joined Mr. Berkman in the basement and he appeared "paranoid" and "shaky." (*Id.* at 353.) He kept telling her to be quiet and was "peeking out the windows." (*Id.*) Ms. Timmerman was also acting "angry and anxious." (*Id.* at 364.) At one point Mr. Berkman threw up in the basement utility sink. (*Id.* at 354.) Ms. Sullivan saw dried blood on his right hand; when she asked him about it, he told her that he "had hurt somebody really bad" and that she didn't want to know any more about it. (Tr. at 356, 363.)

Ms. Sullivan also saw that Mr. Berkman had a bag containing more cocaine than she had ever seen in her life. (*Id.* at 359-60.) She confirmed that Mr. Berkman was working only sporadically in those days, which would be inconsistent with his

---

[7] According to Mr. Barraza, Mr. Berkman told him that after killing Mr. Hawkins, "[w]e just fucking partied and shit, smoking crack and stayed fucked up" for days. (Tr. at 1015.)

ability to purchase such a large amount of cocaine. Megan Johnston, a neighbor who also had no apparent motive to lie, corroborated Ms. Sullivan's testimony that Mr. Berkman had a "large amount of cocaine." (Tr. at 763.) She also confirmed that Mr. Berkman was gone hours longer than expected getting the cocaine and that he seemed "frazzled" and "not himself" when he returned. (*Id.* at 763-64.) When she asked him what was wrong, he told her, "I think you ought to go." (*Id.* at 764.)

Mr. Berkman's friend Shawn Black, another witness with no apparent motive to give false testimony, testified that Mr. Berkman made an inculpatory statement to him as well: Mr. Berkman pointed to a news article about Mr. Hawkins's disappearance and told him that Mr. Hawkins "wouldn't bother him anymore." (*Id.* at 113.) This contradicted Mr. Berkman's statements to police that he had a friendly relationship with Mr. Hawkins and was concerned when he went missing. Mr. Berkman's statement to Mr. Black also suggests that when police only knew that Mr. Hawkins was missing, Mr. Berkman knew that he was dead.

Mr. Berkman took the stand in his own defense and admitted having made the statement to Mr. Black. (*Id.* at 1212.) He also admitted meeting Mr. Hawkins that night in the parking lot of the WiseWay, and to calling Mr. Hawkins on a pay phone to set up the meeting, even though he had a cell phone with him at the time. The WiseWay was a roughly two-minute drive from the home he shared with Ms. Timmerman, but he had no clear explanation for why he was gone several hours, as recounted by Ms. Timmerman, Ms. Sullivan, and Ms. Johnston. By his account, he was only gone from the house about an hour. (*Id.* at 1163.) He denied killing Mr.

Hawkins, but had no explanation as to why he appeared upset and agitated to witnesses when he returned home, or why he made a statement to Ms. Sullivan about having "hurt somebody really bad."

Mr. Berkman offered shifting and contradictory explanations to police when he was initially brought in for questioning.[8] When police asked whether his fingerprints would be found on the phone that was recovered from the WiseWay roof, he "blurted out" that he had "never touched Hawkins's phone." (*Id.* at 1046.) The investigating officer found this odd because he hadn't mentioned Mr. Hawkins. (*Id.*) Mr. Berkman then asked for a glass of water, and when the officer returned, Mr. Berkman said he had forgotten something and that he had picked up Mr. Hawkins's phone after Mr. Hawkins accidentally dropped it. When police questioned him about a watch Ms. Timmerman claimed he had thrown from the car window after burning Mr. Hawkins's car; at one point he said the watch had been lost in Michigan City and at another point he said someone had stolen it from his house. (Tr. at 1054-55.) He admitted to police that the gas can found near Mr. Hawkins's car looked like one he owned, offering an implausible story about a thief breaking into his garage and stealing only the gas can, leaving behind bikes and other more valuable items that were stored there. (*Id.* at 1056; *see also id.* at 568.) He told police he didn't use cocaine, but later admitted to purchasing cocaine from Mr. Hawkins many times, including the night of his disappearance. (*Id.* at 1058.)

---

[8] The investigating officer testified that Mr. Berkman had an "uncontrollable smile" on his face during much of the interview, which the officer found odd given that Mr. Berkman was being questioned about a gruesome murder. (Tr. at 856.)

This circumstantial evidence painted a compelling picture of Mr. Berkman's involvement in the robbery and death of Mr. Hawkins. That police never found any physical evidence linking Mr. Berkman to the crime isn't particularly surprising under the circumstances. The car containing Mr. Hawkins's remains was "burned beyond recognition" in a fire and then left out in the elements for nearly four months before it was discovered. (*Id.* at 739.) Ms. Timmerman didn't come forward until ten months after the crime, after she and Mr. Berkman had both moved out of their residence. Based on a review of the entire record, the court concludes that Mr. Berkman has not established actual prejudice, even assuming the state court's resolution of his confrontation clause claim involving Ms. Timmerman's testimony was erroneous. Therefore, this claim is denied.

### B.     Double Jeopardy Claim

Mr. Berkman's remaining claim asserts that his retrial on the felony murder charge violated the double jeopardy clause. (ECF 1 at 8-9.) The respondent argues that this claim is procedurally defaulted and otherwise without merit under AEDPA standards. (ECF 7 at 16-18.)

Before considering the merits of a claim in a habeas petition, a court must ensure that the petitioner has exhausted all available remedies in state court. 28 U.S.C. § 2254(b)(1)(A); Hoglund v. Neal, 959 F.3d at 832. The exhaustion requirement arises from recognition that the state courts must be given the first opportunity to address and correct violations of their prisoner's federal rights. Davila v. Davis, 137

S. Ct. 2058, 2064 (2017); O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999)). For that opportunity to be meaningful, the petitioner must fairly present his constitutional claim in one complete round of state review. Baldwin v. Reese, 541 U.S. 27, 30-31 (2004); O'Sullivan v. Boerckel, 526 U.S. at 845. This includes seeking discretionary review in the state court of last resort. O'Sullivan v. Boerckel, 526 U.S. at 848. The companion procedural default doctrine, also rooted in comity concerns, keeps federal courts from reaching the merits of a claim when: (1) the claim was presented to the state courts and was denied on the basis of an adequate and independent state procedural ground; or (2) the claim wasn't presented to the state courts and the opportunity to do so has now passed. Davila v. Davis, 137 S. Ct. at 2064; Coleman v. Thompson, 501 U.S. 722, 735 (1991).

Mr. Berkman presented a double jeopardy claim to the Indiana Court of Appeals on direct appeal, Berkman v. State, 976 N.E.2d at 72-73, but he didn't include thT claim in his petition to transfer to the Indiana Supreme Court. (ECF 7-9.) In the post-conviction proceedings, he mentioned double jeopardy in his petition to transfer, but did so only in the context of his claim that his counsel was ineffective in failing to introduce at the retrial evidence of his prior mistrial. (ECF 7-18 at 18-21.) To properly exhaust a claim under 28 U.S.C. § 2254(b)(1)(A), a habeas petitioner must "present both the operative facts and the legal principles that control each claim" at each level of state review. Stevens v. McBride, 489 F.3d 883, 894 (7th Cir. 2007). A free-standing double jeopardy claim involves different facts and legal

principles than a claim of ineffective assistance based on counsel's failure to introduce evidence.

Even if Mr. Berkman's petition to transfer could be read to contain a free-standing double jeopardy claim, that wasn't the proper procedural posture to present such a claim; under Indiana law, a double jeopardy claim must be presented on direct appeal if it was known and available, as Mr. Berkman's claim was. *See, e.g.,* Rohrer v. State, 157 N.E.3d 1264 (Table), 2020 WL 6372985, at *4 (Ind. Ct. App. 2020) (holding that petitioner's "freestanding double jeopardy claim is based on his trial proceedings; accordingly, it was known and available at the time of the original trial and direct appeal, making the issue procedurally foreclosed and unavailable as a freestanding claim of error in this post-conviction proceeding"). Principles of comity preclude Mr. Berkman from asserting a claim in this court that he didn't properly present to the Indiana Supreme Court. Davila v. Davis, 137 S. Ct. at 2064. Mr. Berkman's traverse in support of his petition didn't address the respondent's procedural default argument or provide grounds to excuse his default. (*See* ECF 16; ECF 17.) The court can't reach this claim on the merits.

Even if Mr. Berkman could overcome his procedural default, this claim wouldn't entitle him to federal habeas relief. The Fifth Amendment's double jeopardy clause, made applicable to the states through the Fourteenth Amendment, "provides that no person may be tried more than once for the same offence." Currier v. Virginia, 138 S. Ct. 2144, 2150 (2018) (citation and internal quotation marks omitted). The prohibition applies to retrials following acquittals; a retrial following a trial that

ended in a hung jury generally doesn't violate the double jeopardy clause. <u>Richardson v. United States</u>, 468 U.S. 317, 323-324 (1984).

The double jeopardy clause also encompasses some aspects of the doctrine of collateral estoppel, also called issue preclusion, that might bar a retrial under broader circumstances. <u>Currier v. Virginia</u>, 138 S. Ct. at 2149-2150; <u>Schiro v. Farley</u>, 510 U.S. 222, 232 (1994); <u>Ashe v. Swenson</u>, 397 U.S. 436 (1970). Under the doctrine of issue preclusion, "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot be again litigated by the same parties in any future dispute." <u>Ashe v. Swenson</u>, 397 U.S. at 443. In the criminal context, the doctrine "precludes the Government from relitigating any issue that was necessarily decided by a jury's acquittal in a prior trial." <u>Yeager v. United States</u>, 557 U.S. 110, 119 (2009).

The Supreme Court has cautioned, however, that issue preclusion should have only a "guarded application" in the criminal context. <u>Currier v. Virginia</u>, 138 S. Ct. at 2152. For an earlier verdict to have preclusive effect in a second criminal trial, the defendant must show that that the prosecution in the second trial had to prevail "on an issue the jury necessarily resolved in the defendant's favor in the first trial." <u>Id.</u> at 2150. To decide whether this standard is met, the court must "examine the record of [the] prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter," and inquire "whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration." <u>Ashe v. Swenson</u>, 397 U.S. at 444. "A second trial is not precluded

simply because it is unlikely—or even very unlikely—that the original jury acquitted without finding the fact in question." Currier v. Virginia, 138 S. Ct. at 2150 (citation and internal quotation marks omitted). Rather, the defendant must show that "it would have been irrational" for the jury in the first trial to acquit without finding in his favor on a fact essential to a conviction in the second trial. *Id*. This is a "demanding" test. *Id*. If "there [are] any number of possible explanations for the jury's acquittal verdict," the defendant can't satisfy his burden. Schiro v. Farley, 510 U.S. at 233 (citation and internal quotation marks omitted).

In resolving Mr. Berkman's double jeopardy claim on direct appeal, the Indiana Court of Appeals correctly recognized Ashe v. Swenson as the controlling legal authority. Berkman v. State, 976 N.E.2d at 73. The court concluded that Mr. Berkman didn't establish that the doctrine of issue preclusion barred his retrial on felony murder. *Id*. That determination wasn't objectively unreasonable.

In Mr. Berkman's first trial, he was acquitted of murder, but the jury was couldn't reach a verdict on the felony murder charge.[9] Because the jury in Mr. Berkman's first trial deadlocked on the felony murder count, as a general matter, the double jeopardy clause didn't bar retrial on this count. Richardson v. United States, 468 U.S. at 323. That leaves Mr. Berkman with his contention that issue preclusion

---

[9] In his traverse, Mr. Berkman appears to ask that the court subpoena various documents and conduct an evidentiary hearing so that he can prove he was acquitted of murder in the first trial. (ECF 16 at 15, 23-34; ECF 18.) He includes a lengthy narrative in which he describes a conspiracy among then-Sheriff John Buncich, agents of the Drug Enforcement Administration, his attorney, and others to hide an "acquittal document" somewhere in the Lake County government building so that he had to go to trial a second time. (ECF 16 at 25, 30.) Because it is undisputed that Mr. Berkman was acquitted of murder in the first trial, it's not necessary to pursue this matter further.

applies because "it would have been irrational for the jury" in the first trial to acquit him of murder without finding in his favor on a fact essential to a conviction in the retrial for felony murder. Currier v. Virginia, 138 S. Ct. at 2150 (citation and internal quotation marks omitted).

To convict Mr. Berkman on the murder charge, the first jury needed to find that he "knowingly or intentionally" killed Mr. Hawkins. IND. CODE § 35-42-1-1(1). The charging information alleged that he had committed the murder "by means of a knife, a deadly weapon." (Appellant's App'x at 9.) To convict Mr. Berkman of felony murder, by contrast, the state had to prove only that Mr. Berkman killed Mr. Hawkins while committing or attempting to commit a robbery. IND. CODE § 35-42-1-1(2). As the Indiana Court of Appeals recognized, "the State was not required to prove a knowing or intentional killing in order to sustain a felony murder conviction, only a killing—even an accidental one." Berkman v. State, 976 N.E.2d at 73.

The state court didn't unreasonably apply Ashe v. Swenson in determining that Mr. Berkman's retrial on the felony murder charge wasn't barred by the double jeopardy clause. See Schiro v. Farley, 510 U.S. at 233.

Mr. Berkman suggests that his retrial on the felony murder charge was barred because much of the same evidence was used in the first and second trials. This argument appears to spring from the "actual evidence" test that applies to claims arising under the Double Jeopardy Clause contained in the Indiana Constitution, not the federal Double Jeopardy Clause. See, e.g., Gibson v. State, 111 N.E.3d 247 (Ind. Ct. App. 2018) (under the Indiana Constitution, actual evidence test prohibits

multiple convictions if there is a reasonable possibility that the evidentiary facts used by the fact-finder to establish the essential elements of one offense may also have been used to establish the essential elements of a second challenged offense). Mr. Berkman can't obtain federal habeas relief based on an error of state law. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Earls v. McCaughtry, 379 F.3d at 495. Mr. Berkman's final claim must be denied for these reasons.

### C.     Certificate of Appealability

A court must either issue or deny a certificate of appealability in all cases where it enters a final order adverse to the petitioner. Rule 11, Rules Governing Section 2254 Cases. To obtain a certificate of appealability, a petitioner must make a substantial showing of the denial of a constitutional right by establishing "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (internal quotation marks and citation omitted). The facts of this case are unusual, and given the importance of Ms. Timmerman's testimony to the state's case, reasonable jurists could debate whether the state court unreasonably applied Crawford in determining that this witness was "unavailable." Because no physical evidence was ever found linking Mr. Berkman to the murder, reasonable jurists could also debate whether the admission of Ms. Timmerman's testimony was harmless error. Accordingly, the court will grant Mr. Berkman a certificate of appealability on

this issue. The court concludes that he hasn't made a substantial showing of the denial of a constitutional right with respect to his other two claims.

## III.   CONCLUSION

For all of these reasons, the court GRANTS the motion for an extension of time (ECF 15), DENIES the petition for writ of habeas corpus, and GRANTS the petitioner a certificate of appealability on the following issue: Whether the state court unreasonably applied <u>Crawford v. Washington</u>, 541 U.S. 36 (2004), in concluding that the admission of Arlene Timmerman's testimony did not violate the petitioner's Sixth Amendment right to confront adverse witnesses. The clerk is DIRECTED to close this case.

SO ORDERED on March 4, 2021

s/ Robert L. Miller, Jr._____
JUDGE
UNITED STATES DISTRICT COURT

29